# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

In the Matter of the Search of
(Briefly describe the property to be searched or identify the person by name and address)

Office of Yutong Zhang, M.D.
435 Lancaster Ave, Suite 1
St. Davids, Pennsylvania

)
)
)
)
)

CASE NUMBER: 20-MJ-2157

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*)

### SEE ATTACHMENT A, INCORPORATED HEREIN BY REFERENCE

located in the Eastern District of Pennsylvania, there is now concealed (*identify the person or describe the property to be seized*)

### SEE ATTACHMENT B, INCORPORATED HEREIN BY REFERENCE

The basis for the search under Fed. R. Crim. P. 41(c) is (*check one or more*)

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained]

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| *Code Section* | *Offense Description* |
| 21 U.S.C, § 841(a)(1) | Illegal distribution of controlled substances |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT, INCORPORATED HEREIN BY REFERENCE

☒     Continued on the attached sheet.

☐     Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____/s/Jason A. McKairnes_____
*Applicant's Signature*

___FBI Task Force Officer Jason A. McKairnes___
*Printed Name and Title*

Sworn to before me, and signed in my presence.

Date: ___Dec. 14, 2020_____

_____/s/Hon. Richard A. Lloret_____
*Judge's signature*

City and state: ___Philadelphia, Pennsylvania___

___Hon. Richard A. Lloret, U.S. Magistrate Judge___
*Printed name and title*

Affidavit in Support of a Search Warrant

## Introduction

1.      I, Jason A. McKairnes am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"). Since December 2018, I have been tasked out from the Pennsylvania Office of Attorney General and began my employment there in October of 2016. I am currently assigned to the Philadelphia Field Office where I investigate Health Care Fraud, including violations of Title 18, United States Code, Sections 1349 and 1347, among others, and the distribution of controlled substances including violations of Title 21, United States Code, Section 841(a)(1), among others. I have assisted the FBI in investigations, and participated in investigations that lead to the prosecution of doctors and other health care providers. I have directed cooperating witnesses to conduct consensual recordings and assisted other investigators in consensual recordings during which prescriptions and prescription drugs have been purchased from doctors and pharmacists as well as from unlicensed individuals. Investigations for the distribution of controlled substances often focus on licensed doctors, pharmacists, or other health care professionals who sell prescriptions for controlled substances to their so-called "patients" who are in reality addicts and drug dealers. My investigations, and those of the other investigators with whom I have worked, have also involved other federal criminal laws related to money laundering, currency structuring, and tax evasion.

2.      The FBI and the Pennsylvania Attorney General's Office are investigating a medical doctor, Yutong Zhang, MD (Zhang), currently practicing in St. Davids, Delaware County. As explained in detail below, there is probable cause to believe that Zhang operates his medical practice as a prescription "pill mill" at which people can buy prescriptions for frequently-abused narcotics, without demonstrating that the drugs are medically necessary, without a real doctor/patient relationship, outside the normal course of professional practice, and with no ancillary testing or certification of injuries or illnesses, in violation of 21 U.S.C. § 841(a)(1). As described below, your affiant believes that, beginning in or about at least September 2019 and continuing until the present, Zhang has prescribed medication for frequently abused controlled substances for no legitimate medical purpose in exchange for cash.

3.      As outlined below, evidence gathered to date has shown that Zhang uses his medical practice office located at 435 E. Lancaster Ave., Saint Davids, PA 19087 (the "SEARCH LOCATION") in the Eastern District of Pennsylvania, to furnish the prescriptions at the heart of the investigation, and there is probable cause to believe that evidence and fruits of his illegal prescribing behavior will be found at the SEARCH LOCATION. I, therefore, submit this Affidavit in support of an application for a search warrant for SEARCH LOCATION, described in detail in ATTACHMENT A, incorporated herein by reference, for the items described in ATTACHMENT B, incorporated herein by reference.

4.      The information in this affidavit is based on witness interviews, audio and video recordings, review of documents, surveillance, discussions with other law enforcement officers, my training and experience, and my personal knowledge from participating in the investigation. Because this affidavit is submitted for the limited purpose of establishing probable cause to

search the SEARCH LOCATION, I have only included facts and information relevant to establish probable cause, and have not included every fact I know about this investigation.

5.     A "pill mill" is a doctor's office that dispenses prescriptions or controlled substances inappropriately. In my training and experience, a doctor who is running a pill mill will frequently prefer cash payments for doctor visits, provide prescriptions for controlled substances without an adequate examination, and may also honor patient requests for particular prescriptions, dosages or amounts.

6.     According to publicly accessible records, Zhang is a licensed doctor as well as an acupuncturist. Zhang's Pennsylvania Medical License (MD070668L) was first issued in March of 2000 and expires on December 31, 2020 (unless renewed). Based on surveillance observations, Zhang typically operates his private practice at the SEARCH LOCATION on Mondays, Wednesdays and Fridays from 9:00 am to 3:00pm.[1]

7.     Zhang is registered to accept government health insurance and submit claims to the PA Department of Human Services, including Medicaid and CHIP (Children's Health Insurance Program). As a Medicaid provider, Zhang has agreed to abide by Pennsylvania Department of Human Services ("PA DHS") regulations, and to seek reimbursement for services that are performed for Medicaid Participants.

8.     Zhang is also registered with the Drug Enforcement Administration ("DEA") and is permitted to prescribe Schedule II-V narcotics and pharmaceutical drugs, so long as he does so in the normal course of professional practice and for a legitimate medical purpose.

9.     As discussed herein, based on the investigation to date, your Affiant believes Zhang operates his medical practice as a pill mill at which so-called "patients" can obtain prescriptions for controlled substances regardless of whether there is a medical need for these controlled substances.

### Laws and Rules Concerning Prescribing Medication

10.    The Controlled Substances Act governs the manufacture, distribution, and dispensing of controlled substances in the United States. *See* 21 U.S.C. §§ 801-971. Title 21, United States Code, Section 841, provides that "[e]xcept as authorized, it shall be unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense with intent to manufacture, distribute or dispense, a controlled substance."

---

[1] According to Pennsylvania Department of Labor and Industry, Zhang also receives wages from Neurological Monitoring Services Inc. Zhang has never been observed at any work location other than the SEARCH LOCATION. The investigation to date has focused on Zhang's medical practice at the SEARCH LOCATION, and your affiant is not currently aware of what Zhang's employment with Neurological Monitoring Services, Inc. entails.

11.     Controlled substances are listed on five schedules. Schedule I controlled substances have no accepted medical use, and a high potential for abuse. Schedule II controlled substances have legitimate medical uses, but also have the potential for severe psychological or physical dependence. Substances on Schedules III through V have medical uses, and successively lower potentials for abuse and dependence. *See* 21 U.S.C. § 812. All controlled substances listed on Schedules II through V are legally available to the public with a valid prescription.

12.     A licensed physician who is registered with DEA, such as Zhang, may write prescriptions for controlled substances on Schedules II through V, as long as those prescriptions are issued for a legitimate medical purpose, and the prescriber is acting in the usual course of professional practice. 21 C.F.R. § 1306.04. A prescription for a Schedule II drug cannot be refilled, and (except in an emergency) must be in writing. 21 U.S.C. § 829(a).

13.     Oxycodone is a Schedule II narcotic pain reliever, and is available in many brands and formulations of drugs. Hydrocodone is also a Schedule II pain reliever, and is available combined with the non-scheduled pain reliever acetaminophen. Lortab and Vicodin are a brand names for mixtures of hydrocodone and acetaminophen, and are also Schedule II pain relievers. Ambien is a brand name drug containing zolpidem, a Schedule IV sedative. Ultram is a brand name drug containing tramadol, a Schedule IV pain reliever. Cyclobenzaprine is a non-scheduled drug that is a muscle relaxer, also sold under the brand name Flexeril. Ibuprofen and naproxen are non-scheduled drugs for pain relief, sold under many brand names, including Motrin (ibuprofen) and Naprosyn (naproxen).

14.     Physicians licensed by the Commonwealth of Pennsylvania must follow minimum standards for prescribing controlled substances. 49 Pa. Code § 16.92(b). Those minimum standards are:

(1)     *Initial medical history and physical examination*. An initial medical history shall be taken and an initial physical examination shall be conducted unless emergency circumstances justify otherwise. Medical history and physical examination information recorded by another licensed health care provider may be considered if the medical history was taken and the physical examination was conducted within the immediately preceding 30 days. The physical examination shall include an objective evaluation of the heart, lungs, blood pressure and body functions that relate to the patient's specific complaint.

(2)     *Reevaluations.* Reevaluations of the patient's condition and efficacy of the drug therapy shall be made consistent with the condition diagnosed, the drug or drugs involved, expected results and possible side effects.

(3) *Patient counseling*. The patient shall be counseled regarding the condition diagnosed and the drug prescribed, administered or dispensed. Unless the patient is in an inpatient care setting, the patient shall be specifically counseled about dosage levels, instructions for use, frequency and duration of use and possible side effects.

(4) *Medical Records*. Accurate and complete medical records must document the evaluation and care received by patients.

(i) On the initial occasion when a drug is prescribed, administered or dispensed to a patient, the medical record must include the following:

(A) A specification of the symptoms observed by the licensed health care provider and reported by the patient.

(B) The diagnosis of the condition for which the drug is being given.

(C) The directions given to the patient for the use of the drug.

(D) The name, strength and quantity of the drug and the date on which the drug was prescribed, administered or dispensed.

(ii) After the initial occasion when a drug is prescribed, administered or dispensed, the medical record must include the information required in subsection (b)(4)(i)(D) and changes or additions to the information recorded under subsection (b)(4)(i)(A)-(C).

15.     Pennsylvania requires licensed practitioners to keep medical treatment records for at least seven years. *See* 49 Pa. Code § 16.95. The DEA requires that a registered physician maintain records at his/her office of purchases, distributions, and prescriptions of controlled substances for at least two years. *See* Drug Enforcement Administration Practitioner's Manual, Section IV- Recordkeeping Requirements.

16.     The Pennsylvania Prescription Drug Monitoring Program (PDMP) is a database of all controlled substance prescriptions dispensed in Pennsylvania. Since January 2017, prescribers have been required to query the PDMP, [according to 35 P.S. § 872.8(a)]:

(1) for each patient the first time the patient is prescribed a controlled substance by the prescriber for purposes of establishing a baseline and a thorough medical record;

(2)  if a prescriber believes or has reason to believe, using sound clinical judgment, that a patient may be abusing or diverting drugs; or

(3)  each time a patient is prescribed an opioid drug product or benzodiazepine by the prescriber.

17.    According to 35 P.S. § 872.8(b), the information from a query of the PDMP must be included in the patient's medical record if

(1)   the individual is a new patient; or

(2)  the prescriber determines a drug should not be prescribed or furnished to a patient based upon the information from the system.

18.    In its "Guideline for Prescribing Opioids for Chronic Pain," the Centers for Disease Control and Prevention recommends that physicians prescribe opioids only after weighing whether the expected benefits will likely outweigh the risks, and should set realistic treatment goals for pain and function improvement. If opioids do not provide meaningful improvement for the patient, the CDC recommends discontinuing the drugs. When starting opioid therapy for pain patients, a clinician should use the lowest effective dose and discuss the risks and benefits with the patient. *See* Guideline for Prescribing Opioids for Chronic Pain, available at https://www.cdc.gov/drugoverdose/pdf/prescribing/Guidelines_Factsheet-a.pdf.

## UNDERCOVER OFFICE VISITS

19.    Zhang appears to be the only physician, and the only person, working at the SEARCH LOCATION. His is the only name listed on signage on the door and at the street. Furthermore, in dozens of undercover office visits (summarized below), the undercover patients did not ever observe another physician or staff member at the SEARCH LOCATION.

20.    An undercover officer from the Radnor Township Police Department (hereinafter "UC1") began seeing Zhang as a patient from September 2018 to December 2018. UC1's office visits resumed in January 2020, after FBI became involved in the case, and continued through September 2020. During that time, as summarized below, three undercover officers and a paid confidential human source all sought and received prescriptions from Zhang. During that time, Zhang never reviewed or ordered diagnostic testing, other than an occasional urine dipstick test that was done in the office. In addition, three of the four patients were never informed of any diagnosis.

21.    In September 2018, UC1 began to investigate activities at the SEARCH LOCATION, based on the following information:

• UC1 and other officers with the Radnor Township Police Department had received complaints from area pharmacies that people filling opioid prescriptions written by Zhang did not show any signs or symptoms of associated pain.

- A review of Zhang's prescribing history in the PDMP showed that he was generally writing a two-week supply of low dose Schedule II prescriptions in high numbers of pills. It is more typical for prescribers in the area to prescribe a 20- to 30-day supply of Schedule II prescriptions.

- The PDMP also showed that a large percentage of the patients receiving prescriptions for Schedule II controlled substances from Zhang were paying cash at the pharmacy for the drugs.

- According to the PDMP, some of the patients receiving Schedule II controlled substance prescriptions from Zhang were traveling notable distances from their listed home addresses, places that were sometimes 45 minutes to one hour away by car.

- Radnor Police Department became aware that pharmacies near the SEARCH LOCATION were refusing to fill Schedule II prescriptions written by Zhang.

22.     On September 26, 2018, UC1 became an undercover patient of Zhang, assuming a false identity. Through an initial phone call, Zhang informed UC1 that the first visit would cost $300.00 and that UC1 could come in at 2:00 pm that same day for an office visit. At this first undercover office visit, which was UC1's first face-to face interaction with Zhang, Zhang asked UC1 for identification. UC1 gave Zhang a Department of Transportation Form DL-640, "Acknowledgement of Seized/Surrendered Driver's License/Vehicle Registration." The Form DL-640 does not have a photograph. It is given to persons who are relinquishing their licenses to police. UC1 informed Zhang that he did not have a photo identification. UC1 also had no medical records.

23.     During the first undercover visit, Zhang conducted an examination of UC1 that lasted no more than 5 minutes. During that exam, Zhang pushed on various places of UC1s body, did a strength test of his hands, and had UC1 lie on his back and raise his legs. UC1 informed Zhang that he had not seen a doctor in over 20 years. Zhang told UC1 that he was going to write a prescription for 800 mg of Motrin. UC1 told Zhang he had been able to get prescription medication from friends or off the street in the past, and knew that Motrin would not help. Zhang told UC1 that if he wanted to receive prescription narcotics, UC1 would have to submit to a urine test. UC1 claimed that he was concerned about what the test would show; Zhang assured UC1 that, regardless of what the test showed, Zhang would not release the results to anybody. UC1 provided a urine sample to Zhang. Zhang requested $335.00 for the office visit and the urine test. UC1 informed Zhang that he had only brought $300.00, because he had been told that was the price for the office visit. Zhang told UC1 that it did not include the price of the urine test. Zhang took the $300.00 in cash from UC1 and told UC1 to have the rest of the money by the next visit. Zhang gave UC1 three prescriptions: Ultram 50 mg for 45 pills, Motrin 800 mg for 90 pills, and Flexeril 10 mg for 30 pills.

24.     During this first visit, UC1 also informed Zhang that UC1 was able to find and provide more patients to Zhang. Zhang replied that he had to wait before taking new clients until the relationship between UC1 and Zhang was better established.

25.     UC1 had his next appointment with Zhang on 10/10/2018. UC1 requested Zhang to write a prescription for Oxycodone 15mg. Zhang told UC1 that he had to show a progression of narcotics. On this visit, UC1 received two prescriptions: one prescription for Valium 5 mg for 15 pills, and Oxycodone 5 mg for 45 pills. UC1 paid $125.00 for this appointment, which included the $35.00 balance from the first appointment.

26.     At UC1's third appointment, on 10/24/2018, UC1 asked Zhang for 15 mg of Oxycodone. Zhang told UC1 that there was a "way" the prescriptions must go. At that visit, UC1 received an increase strength of Oxycodone – 10 mg for 45 pills.

27.     On UC1's next visit, on 11/7/2018, UC1 received prescriptions for Oxycodone 15 mg for 56 pills and Ambien 10 mg for 30 pills. On the final visit of UC1's initial undercover operation, on 11/21/2018, UC1 received a prescription for 84 Oxycodone 15 mg, along with prescriptions for Ambien and Flexeril.

28.     Radnor Township Police Department conducted surveillance of Zhang's office on Monday, November 12, 2018, from 09:30 am to 12:30 pm. During that surveillance, seven suspected patients were observed entering the SEARCH LOCATION and spending between 5-10 minutes inside. Patients arrived one at a time at the office and went into the office at 15-30 minute intervals, as though attending scheduled appointments. In some instances, patients stayed in their cars or in the vicinity of their car until the quarter or half-hour mark until they went into the office.

29.     After approaching the FBI, undercover visits were reinitiated on January 29, 2020. UC1 told Zhang that he had spent the year in Las Vegas, to work on a stadium construction project. UC1 told Zhang that he wanted to start seeing Zhang again for his prescriptions. UC1 told Zhang that he understood that Zhang would need to "start over" with him again, by giving UC1 the lowest strength and "work [his] way up." UC1 received Oxycodone 5 mg on his next visit, on February 12, 2020.

30.     On February 26, 2020, UC1 introduced a Supervisory Special Agent from the Pennsylvania Office of Attorney General (hereinafter, "UC2") as his girlfriend. During UC2's initial visit, she told Zhang she had a sore back from working at a daycare. Zhang told UC2 that he needed to run "checks" on UC2. Zhang took UC2's undercover identification to the computer at the desk in his office and operated the computer with UC2's ID. After this, Zhang had UC2 push against Zhang's hands with parts of her body such as her knees or hands in a basic strength test. Zhang also had UC2 reach to different parts of her body or the floor. Zhang diagnosed UC2 with a herniated disc and prescribed Flexeril and Motrin. Zhang charged UC2 $300.00. UC1 paid Zhang in cash for UC2's visit by handing the money directly to Zhang. Zhang retrieved a lump of cash from his pocket, placed the money that UC1 provided with this lump

sum, and then made change and gave it to UC1. Zhang then put the money back into his pocket.

31.     UC2 skipped several appointments with Zhang, on the following dates: 3/30/2020, 4/17/2020, 5/1/2020, 6/12/2020, 7/15/2020, and 7/24/2020. Despite this, on each of those dates, Zhang gave UC1 prescriptions for UC2, and collected cash payments from UC1 as if UC2 had attended her appointments.

32.     UC2 was not present for what was to be her third visit to Zhang, on March 30, 2020. UC1 came to the office for his own scheduled appointment and asked Zhang if he could "give [UC2] something please . . . you were gonna up her. Just even if you give her 5's [oxycodone 5 mg]. I'll pay for the visit. It's fine." After Zhang provided UC1 his own prescription and a prescription for UC2 of Ultram/Tramadol, UC1 asked Zhang, "What do I owe you now?" Zhang replied, "It will be both visits." UC1 gave Zhang $180.00 in U.S. currency for the prescriptions for both UC1 and UC2.

33.     UC2 also was not present for her fourth visit, on April 17, 2020. At that time, UC1 got his own prescription for Oxycodone 15 mg, and asked about giving UC2 a stronger prescription. UC1 stated, "I understand we have to start at the beginning, and we've been starting at the beginning." Zhang replied, "I'll give her some Vicodin this time." At that visit, Zhang prescribed 56 Vicodin pills for UC2, and gave the prescription to UC1. UC1 paid Zhang $180.00 for his own visit and UC2's visit.

34.     On February 19, 2020, an FBI Confidential Human Source (hereinafter, "CHS") began visiting Zhang for medical appointments.[2] On the initial visit, CHS underwent a limited physical examination similar to that of UC1. CHS told Zhang that his back hurt, and that he was performing the physical motions of the exam to the best of his ability. At the end of this visit, CHS received prescriptions for Cyclobenzaprine and Naproxen. CHS paid Zhang $335.00 in cash for this initial visit and a urine test, by handing the money to Zhang.

35.     At CHS's second visit, on February 26, 2020, CHS began to receive prescriptions for Schedule II controlled drugs, starting with Hydrocodone/Acetaminophen, and, over the course of his visits, eventually progressing to 90 pills of Oxycodone 10 mg. During the course of CHS's appointments, Zhang never sought or prescribed any imaging, such as an x-ray, MRI, or CT scan. Zhang never told CHS a diagnosis.

---

[2] The CHS has performed undercover work for the Federal Bureau of Investigation, in exchange for payment on previous and ongoing investigations for approximately ten years. Over that course of time, the CHS has provided reliable information, has made consensual recordings in undercover operations, and has assisted the FBI with at least three other investigations. Furthermore, the debriefings of the CHS in this investigation and the leads the CHS provided was able to be corroborated through the recordings as well as surveillance and investigatory actions.

36.     On July 15, 2020, a Special Agent from the Pennsylvania Office of Attorney General (hereinafter, "UC3") was introduced to Zhang by UC1. UC3 claimed to be a coworker of UC1. UC3 complained of general back pain related to construction work. After performing range of motion and resistance tests similar to those administered to UC1 and UC2, UC3 received two prescriptions – one for Ultram and one for Naprosyn. UC3 was charged $325.00 for the first visit and urine test, which UC1 paid in cash by handing the money to Zhang.

37.     On his second visit, on July 24, 2020, UC3 received a prescription for Vicodin, a Schedule II narcotic. Over the course of UC3's office visits with Zhang, UC3 was never diagnosed with an illness and was never sent for additional testing to address any medical issues.

38.     All of the covert office visits were short in doctor-to-patient interaction, typically lasting between two to seven minutes, although the first time each patient had an appointment with Zhang, the visit was longer and involved filling out paperwork. All of the covert office visits that were performed by the FBI were audio and video recorded, although on one occasion, UC1's office visit on July 15, 2020, the video recorder failed to operate properly. UC1 memorialized his interactions in a statement. Prior to FBI's involvement, only one visit was recorded, on December 21, 2018.

39.     The charts below outline and describe the covert office visits, including the types and strengths of drugs prescribed, and payments to Zhang.

| UC1 | | | | |
|-----|-----|-----|-----|-----|
| Date | Prescription | Quantity | Schedule | Cost |
| 9/26/2018 | Ultram 50mg | 45 | IV | $300 |
| | Motrin 800mg | 90 | Non Schedule | |
| | Flexeril 10mg | 30 | Non Schedule | |
| 10/10/2018 | Valium 5mg | 15 | II | $125 |
| | Oxycodone 5mg | 45 | II | |
| 10/24/2018 | Valium 5mg | 15 | II | $90 |
| | Oxycodone 10mg | 45 | II | |
| 11/7/2018 | Ambien 10mg | 30 | IV | $90 |
| | Oxycodone 10mg | 45 | II | |
| 11/21/2018 | Ambien 10mg | 30 | IV | $90 |
| | Flexeril 10mg | 30 | Non Schedule | |
| | Oxycodone 15mg | 84 | II | |
| 12/12/2018 | Oxycodone 15mg | 60 | II | $90 |
| 12/21/2018 | Oxycodone 15mg | 90 | II | $90 |
| 1/29/2020 | Ultram, 50mg | 45 | IV | $300 |
| | Motrin, 800mg | 90 | Non Schedule | |
| | Cyclobenzaprine, 10mg | 30 | Non Schedule | |

| Date | Prescription | Quantity | Schedule | Cost |
|---|---|---|---|---|
| 2/12/2020 | Ambien, 10mg | 30 | IV | $125 |
| | Oxycodone, 5mg | 30 | II | |
| | Oxycodone, 5mg *(Post Date 2/21/20)* | 30 | II | |
| 2/26/2020 | Oxycodone, 10mg | 70 | II | $90 |
| | Cyclobenzaprine, 10mg | 30 | Non Schedule | |
| 3/11/2020 | Oxycodone, 5mg | 70 | II | $90 |
| | Cyclobenzaprine, 10mg | 80 | Non Schedule | |
| 3/30/2020 | Oxycodone, 10mg | 80 | II | $90 |
| 4/17/2020 | Oxycodone, 15mg | 56 | II | $90 |
| 5/1/2020 | Oxycodone, 15mg | 56 | II | $90 |
| 5/15/2020 | Oxycodone, 15mg | 56 | II | $90 |
| 5/29/2020 | Oxycodone, 15mg | 56 | II | $90 |
| 5/29/2020 | Cyclobenzaprine, 10mg | 30 | Non Schedule | $90 |
| 6/12/2020 | Oxycodone, 15mg | 56 | II | $90 |
| | Ambien, 5mg | 30 | IV | |
| | Oxycodone, 15mg *(Post dated, 6/25/20)* | 56 | II | |
| 7/15/2020 | Cyclobenzaprine, 10mg | 30 | Non Schedule | $90 |
| | Oxycodone, 15mg | 56 | II | |
| 7/24/2020 | Oxycodone, 10mg | 90 | II | $90 |
| 8/14/2020 | Oxycodone, 15mg | 56 | II | $125 |
| 9/2/2020 | Oxycodone, 15mg | 56 | II | $90 |
| | Cyclobenzaprine, 10mg | 30 | Non Schedule | |
| 9/16/2020 | Oxycodone, 15mg | 84 | II | $90 |

| CHS | | | | |
|---|---|---|---|---|
| Date | Prescription | Quantity | Schedule | Cost |
| 2/18/2020 | *CHS went to Office, office closed* | | | |
| 2/19/2020 | Cyclobenzaprine,10mg | 30 | II | $335 |
| | Naproxen, 500mg | 60 | Non Schedule | |
| 2/26/2020 | Hydrocodone/Acetaminophen, 7.5/325mg | 56 | II | $90 |
| 3/11/2020 | Hydrocodone/Acetaminophen 7.5/325mg | 56 | II | $90 |
| | Naproxen, 500mg | 60 | Non Schedule | |
| 4/1/2020 | Hydrocodone/Acetaminophen, 7.5/325mg | 105 | II | $90 |
| | Lortab, 10/500mg | 70 | II | |
| 4/15/2020 | Lortab, 10/500mg | 70 | II | $90 |
| 4/29/2020 | Oxycodone, 10mg | 60 | II | $90 |
| | Naproxen, 500mg | 60 | Non Schedule | |

| 5/13/2020 | Oxycodone, 10mg | 60 | II | $90 |
|---|---|---|---|---|
| 5/27/2020 | Oxycodone, 10mg | 60 | II | $90 |
| 6/10/2020 | Oxycodone, 10mg | 60 | II | $90 |
| 6/24/2020 | Oxycodone, 10mg | 60 | II | $90 |
| 7/8/2020 | Oxycodone, 10mg | 60 | II | $90 |
| 7/22/2020 | Oxycodone, 10mg | 60 | II | $90 |
| | Oxycodone, 10mg (*Post Dated 8/4/20*) | 60 | II | |
| 8/19/2020 | Oxycodone, 10mg | 60 | II | $125 |
| 9/2/2020 | Oxycodone, 10mg | 60 | II | $90 |
| 9/16/2020 | Oxycodone, 10mg | 90 | II | $90 |

| UC2 | | | | |
|---|---|---|---|---|
| **Date** | **Prescription** | **Quantity** | **Schedule** | **Cost** |
| 2/26/2020 | Motrin, 800mg | 90 | Non Schedule | $300 |
| | Cyclobenzaprine, 10mg | 30 | Non Schedule | |
| 3/11/2020 | Ultram/Tramadol, 50mg | 60 | IV | $125 |
| 3/30/2020 | Ultram/Tramadol, 50mg | 60 | IV | $90 |
| 4/17/2020 | Hydrocodone/Vicodin, 5/300mg | 56 | II | $90 |
| 5/1/2020 | Oxycodone, 5mg | 42 | II | $90 |
| 5/15/2020 | Oxycodone, 5mg | 50 | II | $90 |
| 5/29/2020 | Oxycodone, 10mg | 42 | II | $90 |
| 6/12/2020 | Oxycodone, 10mg | 50 | II | $90 |
| | Oxycodone, 10mg (*Post Dated 6/25/20*) | 50 | II | |
| 7/15/2020 | Oxycodone, 10mg | 50 | II | $90 |
| 7/24/2020 | Oxycodone, 5mg | 50 | II | $90 |
| 9/2/2020 | Oxycodone, 10mg | 50 | II | $90 |
| | Flexeril, 60mg | 5 | Non Schedule | |
| 9/16/2020 | Oxycodone, 10mg | 75 | II | $90 |

| UC3 | | | | |
|---|---|---|---|---|
| **Date** | **Prescription** | **Quantity** | **Schedule** | **Cost** |
| 7/15/2020 | Ultram, 500mg | 30 | IV | $335 |
| | Naprosyn, 500mg | 60 | Non Schedule | |
| 7/24/2020 | Vicodin, 5/300mg | 84 | II | $90 |
| 8/14/2020 | Vicodin, 7.5/300mg | 56 | II | $90 |

| 9/2/2020 | Percocet, 5/325mg | 56 | II | $90 |
|----------|-------------------|-----|--------------|------|
|          | Flexeril, 5mg     | 60 | Non Schedule |      |
| 9/16/2020 | Oxycodone, 5mg   | 85 | II           | $90 |

40.     On almost all of the covert patient visits, the CHS or undercover officers observed that Zhang carries loose cash on his person, not kept in any wallet or pouch. This U.S currency is kept in either his front or back pocket, and Zhang pulls it out to make change then returns the money to his pocket.

41.     From the beginning of their covert visits until May 15, 2020, UC1, UC2 and CHS were all filling the prescriptions they received from Zhang at the Walmart Pharmacy located at 275 N Gulph Rd, King of Prussia, PA 19406, so that if Zhang checked the PDMP, he would see that UC1, UC2, and CHS were picking up the prescribed medications. Beginning on May 15, 2020, however, the undercover patients stopped filling the prescriptions. If Zhang checked the PDMP, he would have seen that the prescriptions had not been filled. UC3 never filled any of the prescriptions he received from Zhang.

## ZHANG'S SCHEDULE II PRESCRIPTIONS

42.     A report from the PDMP shows that, from January 1, 2016 until December 1, 2020, 217 different patients have filled 6,882 prescriptions written by Zhang for Schedule II controlled substances. Of the 6,882 prescriptions, 3,810 prescriptions were for Oxycodone HCL 15 mg. Oxycodone HCL 10 mg was the next-most frequently prescribed Schedule II controlled substance, with 698 prescriptions. Review of Zhang's billings to the Pennsylvania Medicaid Program shows that Zhang only billed Medicaid for two patients seen at his office, both of whom have been receiving Schedule II prescriptions from Zhang.

## OBSERVATIONS OF THE SEARCH LOCATION

43.     As set forth above, undercover officers and the CHS have been present inside the SEARCH LOCATION on many occasions.

44.     Upon entering the SEARCH LOCATION, there is a lobby area with seats where patients can wait for the doctor. Also in this lobby is a desk with a computer and related equipment on it. Zhang has never been seen to use this computer. On the far wall of the lobby, there is a small room that contains filing cabinets. To the left of the lobby is a hallway with two doors opposite of one another.

45.     The hallway door on the left leads to an individual office used by Zhang, with a computer on a desk that is in the center of the room, and two filing cabinets behind the desk. The undercover patients were sometimes taken to this office, and observed Zhang using the computer there. In addition, Zhang also provided patient intake forms that appeared to have been prepared on a computer. Stacks of manila folders were also seen at times on one of the filing cabinets.

46.     The opposite hallway door, on the right, leads to an examination room. Directly at the end of the hallway is a restroom.

47.     Prior to COVID-19-related lockdowns, Zhang would either bring the undercover patient to the exam room to perform an examination, or to his office if he was not performing an examination. After COVID-19-related lockdowns began, in or about mid-March 2020, Zhang had patients wait in the lobby of the SEARCH LOCATION for the duration of most of the visits.

48.     In addition to surveillance conducted during each covert office visit, FBI also conducted surveillance of Zhang on the following dates: August 17, 2020 through August 21, 2020; September 9, 2020; September 14 and 15, 2020. On four of those eight days of surveillance, Zhang was observed going from his house to the SEARCH LOCATION and from the SEARCH LOCATION back to his house at the end of the day, stopping at a local grocery store on his way home, on two occasions. Although Zhang has a bank account with cash deposits (as set forth below), he was never observed going to a bank while under surveillance.

## FINANCIAL INFORMATION

49.     According to loan records from the Small Business Association, Zhang applied for a Paycheck Protection Program loan, relating to the COVID-19 pandemic, on June 8, 2020. Zhang applied on behalf of Yutong Zhang, MD, PLLC, and gave its location as 435 East Lancaster Avenue, Suite 1, Saint Davids, PA. As part of the application, Zhang reported earning an annual salary of $78,048.00 from Yutong Zhang, MD, PLLC. Zhang lists himself as the sole proprietor, of the business, which, he reports, has only one employee.

50.     Financial records show that Zhang is the sole owner of a Bank of America savings account (last four digits 0727). From December 2017 until July 2020, a total of $92,000 was deposited in cash into the 0727 account. Cash deposits were made roughly every two weeks. Zhang has other bank accounts solely in his name. Those accounts have minimal cash deposits.

51.     From my training and experience, I am aware that doctors who sell drugs or prescriptions for addictive drugs frequently prefer to be paid in cash. Doctors engaged in these illegal activities often conceal cash at their offices, residences, safety deposit boxes, or by depositing and shifting funds into and among various financial accounts.

52.     The pattern established by Zhang in covert office visits shows that he charges each pain "patient" $300.00 for the first visit and $90.00 for each follow-up visit, with an additional charge if he requires urine screening. Zhang accepts cash payments from patients in exchange for these services, and carries loose cash in his pockets.

## COMPUTER INFORMATION

53.     From my training and experience, I know computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation and frequently collect and store information about crimes in the form of

electronic data. As set forth in this affidavit, there is probable cause to believe Zhang uses a computer in his medical office, because undercover officers observed him using a computer. In addition, Zhang provided the undercover patients with forms to complete that appeared to have been prepared on a computer. Information stored on computers at the SEARCH LOCATION concerning the medical business and/or finances would be relevant to drug distribution scheme. Also, pursuant to Pennsylvania Act 96 of 2018, physicians are required to issue electronic prescriptions for Schedule II-V controlled substances, as of October 24, 2019. Thus, there must be computer records of these prescriptions.

54.     Based on the facts set forth above, Rule 41 of the Federal Rules of Criminal Procedure authorizes the government to seize and retain evidence and instrumentalities of a crime for a reasonable time, and to examine, analyze, and test them.

a. Hardware

Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes (but is not limited to) any data processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor type binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM and ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b.  Software

Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like tax preparation, bookkeeping, word-processing, graphics or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

c.   Documentation

Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

d.   Passwords and Data Security Devices

Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

55.     Based on my training and experience, and discussions I have had with other law enforcement agents, I understand that, in most cases, a thorough search of information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.   Time required for examination

As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for searching electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements

Computers can be configured in several different ways, featuring a variety of
different operating systems, application software, and configurations.
Therefore, searching them sometimes requires tools or knowledge that
might not be present on the search site. The vast array of computer
hardware and software available makes it difficult to know before a search
what tools or knowledge will be required to analyze the system and its data
at the SEARCH LOCATION. However, taking the storage media off-site and
reviewing it in a controlled environment will allow its examination with the
proper tools and knowledge.

56.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am
applying for would permit seizing, imaging, or otherwise copying storage media that reasonably
appear to contain some or all of the evidence described in the warrant, and would authorize a
later review of the media or information consistent with the warrant. The later review may
require techniques, including but not limited to computer-assisted scans of the entire medium,
that might expose many parts of a hard drive to human inspection in order to determine
whether it is evidence described by the warrant.

57.     Based upon my knowledge, training, and experience, I know files are easily
transferred among computers and storage media. I also know that doctors who make money
illegally prescribing frequently-abused controlled substances often maintain receipts, notes,
ledgers, records of drug transactions, financial records and other records to track their business
in their offices. Such records may be stored in paper and/or electronic formats. Accordingly,
this warrant requests authority to seize any electronics and storage media or devices that are
found at the SEARCH LOCATION.

58.     Based upon my knowledge, training and experience, I know searching
computerized information for evidence or instrumentalities of crime may require agents to
seize most or all of a computer system's input (scanners, keyboards, mouse, digital readers,
power cords)/output (monitor, projector, plotter, speakers) peripheral, related software,
documentation, and data security devices (including passwords) so a qualified computer expert
can accurately retrieve the system's data in a laboratory or other controlled environment. This
is true because the peripheral devices that allow users to enter or retrieve data from the
storage devices vary widely in their compatibility with other hardware and software. Many
system storage devices require particular input/output (or "I/O") devices in order to read the
data on the system. In many cases, it is important the analyst be able to properly re-configure
the system as it operated, in order to accurately retrieve evidence. In addition, the analyst
needs the relevant system software (operating systems, interfaces, and hardware drivers) and
any applications software which may have been used to create the data (whether stored on
hard drives or on external media), as well as all related instruction manuals or other
documentation and data security devices.

## CONCLUSION

59.     Based on my training, experience, my participation in drug-diversion and health care fraud investigations, and consultations with other law enforcement agents, I know that doctors who sell drugs or prescriptions for frequently-abused narcotics:

a.      often keep cash at home, in their car, or other private location, such as an office, in part because they are frequently dealing in cash and need to hold it in a secure location.

b.      often keep books, records, receipts, notes, ledgers, money orders or other papers to track their business – they keep this either at work, at home, in a car or safe deposit box;

c.      often hide other financial instruments such as money orders, precious metals, jewelry, automobile titles, luxury items, and other items of value and/or proceeds from drug transactions and evidence of financial transactions at work, at home, in a car or other private location;

d.      commonly keep patient addresses or telephone numbers in books, papers, or in electronic form in cell phones or computers; and

e.      frequently maintain records related to their drug dealing in documentary and electronic form stored on computers or other electronic storage medium.

60.     I submit that this affidavit supports probable cause for a warrant to search the SEARCH LOCATION described in Attachment A and seize the items described in Attachment B.

61.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness

Respectfully submitted,


        /s/Jason A. McKairnes
Jason A. McKairnes
Special Agent
Pennsylvania Office of Attorney General
Medicaid Fraud Control Unit


Subscribed and sworn to before me
this  14th       day of December, 2020



/s/Hon. Richard A. Lloret
HON. RICHARD A. LLORET
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**
**DESCRIPTION OF SEARCH LOCATION**
**Office of Yutong Zhang, M.D., 435 Lancaster Ave, Suite 1, St. Davids, Pennsylvania**

The office of Yutong Zhang (the "Search Location") is located in Suite 1, at 435 Lancaster Avenue, a four-story, red brick apartment building known as Aberwyck Apartments, that stands at the intersection of Lancaster Avenue and Chamounix Road in St. Davids, Delaware County, Pennsylvania. The Search Location is an office suite, with a dedicated ground-floor entrance, accessed from a sidewalk along the Lancaster Avenue side of the building. The Search Location's entrance is a glass exterior door labeled "Yutong Zhang, MD, PhD. Physical Medicine – Pain Management – Acupuncture – Auto/Work/Sports Injuries 435 E Lancaster Ave. Ste 1 (610) 665-4025." A red sign visible from Lancaster Avenue says "Aberwyck Apartments" and also lists "Yutong Zhang, MD, PhD 610.665.4025 Physical & Pain Medicine, Acupuncture." No apartments or other businesses are accessible from the entrance to the Search Location.





**ATTACHMENT B**
**DESCRIPTION OF ITEMS TO BE SEIZED**

**Evidence of distribution of controlled substances violations under Title 21, United States Code, Sections 841(a)(1).**

1.      All patient files for persons who have received one or more prescriptions from YUTONG ZHANG for a Schedule II controlled substance.

2.      All documents reflecting appointments and/or office visits from customers or patients, including but not limited to, sign-in sheets, logs, schedule and appointment books, calendars, ledgers, and telephone logs and/or messages.

3.      All financial records relating to the distribution of controlled substances or prescriptions for controlled substances or the purported provision of medical services by YUTONG ZHANG, including check books and registers, cash receipt books and receipts, credit card receipts and statements, employee and contractor payment records, ledgers, accounting records, bank statements, and deposit receipts.

4.      Any records of claims to health care benefit programs for services to patients receiving controlled substances, and records concerning payments on any such claims; rejected claims; and explanations of benefits

5.      All documents related to billing of customers or patients.

6.      All calendars for YUTONG ZHANG, and documents relating to hours worked by YUTONG ZHANG.

7.      All personnel records and payroll for YUTONG ZHANG, and any current or former employees or agents.

8.      All documents relating to training of YUTONG ZHANG concerning prescribing controlled substances.

9.      Personal and business financial records of YUTONG ZHANG, including accounting books, tax records, general journals, cash receipts journals, cash disbursement journals, sales journals, general ledgers, bank statements, deposit slips, withdrawal slips, cancelled checks, and other bank account records, and any and all other records relating to the income or expenses of the YUTONG ZHANG and/or his medical practice.

10.     All documents relating to the proper dispensing of drugs, including records on the interaction of controlled substances with other medications, patient warnings and information, and other documents kept to comply with DEA regulations or rules issued under the authority of the Controlled Substances Act, 21 U.S.C. § 801 et seq.

11.     All prescription records, including copies of prescriptions, logs or records of prescriptions dispensed, and sample prescription pads.

12.     United States currency or other financial instruments.

13.     Records evidencing shipments from pharmaceutical manufacturers or distributors, including but not limited to receipts, invoices, payments, or shipping records.

14.     Any locked safe or file cabinet large enough to contain any of the items described above that cannot be opened on site.

15.     All computer passwords, keywords and other data security devices designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software, or other programming code.  Any password or encryption key that may control access to a computer operating system, individual computer files, or other electronic data.

16.     The following computer-related items may be seized and searched for the records identified above:

a.   Any computer hardware or computer related equipment capable of creating or storing information in electronic or magnetic form;

b.   Any computer peripheral used to facilitate the transmission, creation, display, encoding or storage of information, images and data including word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners;

c.   Any magnetic or electronic storage device such as floppy diskettes, hard disks, backup tapes, CO-ROMs, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives or electronic notebooks;

d.   Computer software, documentation, operating logs and instruction manuals relating to the operation of the computer hardware and software to be searched;

e.   Application software, utility programs, compilers, interpreters, and other programs or software used to facilitate direct or indirect communication with the computer hardware and software to be searched;

f.   Any physical keys, encryption devices and similar physical items that are necessary to gain access to the computers to be searched or are necessary to gain access to the programs, data and information contained on the computer to be searched;

g.   Any passwords, password files, test keys, encryption codes or other computer codes necessary to access the computers to be searched or to convert data, files or information on the computers into a readable form; and

      h.   Electronically stored communications or messages, including electronic mail.

Agents are specifically authorized to remove computer equipment and to search it offsite.